[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[1] We sua sponte consolidate cases 05CA18 and 05CA25 for the sole purpose of this decision and judgment.
 DECISION AND JUDGMENT ENTRY
{¶ 1} Stacy Gorham ("Father") appeals the judgment of the Washington County Court of Common Pleas, Juvenile Division, denying his motion for custody of his daughter, Baylee Nicole Schwendeman (DOB: July 3, 1997). Father contends that the trial court's judgment allowing Traci Schwendeman ("Mother") to retain custody of Baylee is against the manifest weight of the evidence and contrary to law. Because the record contains no evidence that Mother is suitable to parent Baylee, but contains substantial evidence that Mother is unsuitable to parent Baylee, we conclude that this substantial evidence overcomes the presumption of parental suitability inherent in R.C. 3109.04(F)(1) and find that the trial court's determination that Mother is a suitable parent is against the manifest weight of the evidence. Accordingly, we sustain Father's sole assignment of error. Baylee's maternal grandparents, Carol and Larry Schwendeman, ("Carol" and "Larry", collectively "the Schwendemans") also appeal the judgment granting custody of Baylee to Mother and denying their petition for custody of Baylee. The Schwendemans contend that an award of custody to Father would be detrimental to Baylee, and therefore, the trial court erred in determining that Father is a suitable parent. Because we find that the trial court did not abuse its discretion in determining that any detriment caused by the change of environment does not rise to a sufficient level to render Father unsuitable, we overrule the Schwendemans' sole assignment of error. Accordingly, we reverse the judgment of the trial court in part and remand this cause for further proceedings consistent with this decision.
 I. {¶ 2} In February 1998, the Washington County Child Support Enforcement Agency issued an administrative order establishing Father's parentage of Baylee. In April 1998, the Schwendemans filed a petition for custody of Baylee and obtained a temporary custody order. Thereafter, Father answered the Schwendeman's petition and filed his own complaint for custody. Mother opposed the efforts of Father and the Schwendemans and sought to obtain custody of the child. On July 12, 2000, the trial court issued a decision and judgment entry, wherein it granted Mother custody of Baylee and standard visitation to Father. The parties do not dispute that Baylee has lived most of her life in the Schwendeman home.
 {¶ 3} In February 2004, Mother was convicted of felony charges and sentenced to a term of imprisonment in the Ohio Reformatory for Women. Mother left Baylee in the Schwendemans' care. Then, in July 2004, Father filed a motion to modify custody and a request for temporary orders. The Schwendemans also petitioned the court for custody of Baylee. It appears from the record that Mother was served with a summons and Father's motion for custody. She did not enter an appearance or otherwise participate in the proceedings below, except to file a consent to placement, stating that she consented to her parents, the Schwendemans having custody of Baylee.
 {¶ 4} The trial court granted the Schwendemans temporary custody of Baylee during the pendency of the action. Therefore, at the time of the hearing, Baylee resided with Schwendemans' and her older half-brother, Aaron. Baylee has a very close relationship with Aaron. Baylee's younger half-sister Lauryn also resided in the Schwendemans' home until her father obtained custody of her. Lauryn visits the Schwendeman residence every other week.
 {¶ 5} At the hearing, Father testified and presented the testimony of his sister, a friend, and Baylee's guardian ad litem. Father also entered certified copies of three of Mother's criminal sentencing entries into evidence. The Schwendemans presented Carol's Schwendeman's own testimony, along with the testimony of Baylee's school principal, their neighbor, a friend, and several family members. Additionally, the magistrate conducted an in camera interview with Baylee at the Schwendemans' request.
 {¶ 6} After considering all of the evidence, the magistrate issued a magistrate's decision and order. The magistrate first addressed Father's motion to modify custody in the context of a custody determination between the two parents. Applying R.C.3109.04(E), he found that a change of circumstances occurred as the result of Mother's incarceration, which the parties anticipated to continue until December 2005. Relying upon the Second Appellate District's decision in Dunn v. Martin (Aug. 2, 1997), Montgomery App. No. 15208, the magistrate found that he could not determine custody based solely upon Mother's incarceration. Instead, he proceeded to determine the best interest of the child in accordance with R.C. 3109.04(F)(1). The magistrate noted that Mother did not agree to place Baylee in Father's custody and that Baylee was not integrated into Father's family. However, he noted that Baylee has been integrated into the Schwendeman's home since birth, and that based upon the holding in Davis v. Wilson (1997), 123 Ohio App.3d 19, it was proper to consider the Schwendeman's willingness to assist Mother in caring for Baylee.
 {¶ 7} Then, the magistrate specifically found that there was no evidence that Mother's incarceration detrimentally effected Baylee. Accordingly, the magistrate equated Mother's incarceration with the absence of a custodial parent serving in the military. The magistrate found that there were numerous advantages to leaving Baylee in her current environment, where she has flourished, including the following: (1) Baylee would continue to attend the same school she has attended since kindergarten; (2) Baylee would continue to be surrounded by a very supportive extended family; (3) Baylee would continue her close relationship with her brother, Aaron; (4) Baylee could continue her relationships with her neighbors; (5) Carol does not work outside the home and is available at all times to care for Baylee, making daycare with non-family members unnecessary.
 {¶ 8} While the magistrate found the advantage of granting Father custody would be that Baylee would spend time with Father every night, he also found the following disadvantages: (1) Father's environment offers Baylee isolation from what she has grown up with; (2) Baylee would have to attend a new school in a new county; (3) Baylee would have to take a bus from school to a daycare center before Father picked her up after work; (4) If Father has to work late, Baylee would have to stay with a non-family member until Father could pick her up; (5) Baylee would most likely spend school vacations in daycare instead of with family members; (6) Father has only one week of vacation available each year; (7) During the in camera interview, Baylee expressed concerns regarding her fear of the large dogs in Father's neighborhood, and expressed her belief that Father does not like his neighbors.
 {¶ 9} Based upon the foregoing, the magistrate found that the advantages of granting custody to Father did not outweigh the harm caused by removing Baylee from her current environment. While recognizing that Mother had many legal difficulties, the magistrate noted that she also has "the assistance of her parents who have been willing and able to assist [Mother] with insuring that Baylee has a stable and secure environment." The magistrate stated that Baylee's positive personality was the result of her current environment, and, therefore, found that modification of the existing custody order was not in Baylee's best interest. Accordingly, the magistrate denied Father's custody motion.
 {¶ 10} The magistrate then went on to consider the Schwendeman's petition for custody. In doing so, the magistrate recognized that pursuant to the Ohio Supreme Court's decision inIn re Perales (1977), 52 Ohio St.2d 89, a court may not award custody to a non-parent without first making a finding of parental unsuitability. The magistrate specifically found that both Father and Mother were suitable parents, although he noted that Mother's suitability "is based on great part on her family's willingness to assist her with Baylee while she is in prison." Because he found that both parents are suitable parents, the magistrate denied the Schwendemans' petition for custody.
 {¶ 11} Both Father and the Schwendemans objected to the magistrate's decision. Additionally, Father filed a motion to set aside the magistrate's order, which the Schwendemans opposed.
 {¶ 12} After reviewing the magistrate's decision and the record, the trial court issued a decision and order on March 23, 2004, wherein it found that the evidence and the law supported the magistrate's decision. Accordingly, the trial court overruled the parties' objections, affirmed the magistrate's decision, and denied Father's motion to set aside the magistrate's order.
 {¶ 13} Father timely appeals, in Case No. 05CA18, raising the following assignment of error: "THE JUDGMENT OF THE MAGISTRATE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW. THE DECISION OF THE JUDGE FINDING THAT THE MAGISTRATE'S DECISION IS SUPPORTED BY THE EVIDENCE AND THE LAW WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 14} The Schwendemans also timely appeal, in Case No. 05CA25, raising the following assignment of error: "THE COURT ERRED BY FINDING THAT THE FATHER, STACY GORHAM, IS A SUITABLE PARENT FOR THE CHILD, THE COURT MISINTERPRETED THE STANDARD OF SUITABILITY SET FORTH IN IN RE PERALES (1977), 52 OHIO ST.2D [89], WHICH REQUIRES THAT HELD THAT (sic) BEFORE A PARENT CAN BE FOUND TO BE SUITABLE, A FINDING MUST BE MADE THAT PLACEMENT WITH THAT PARENT WOULD NOT BE DETRIMENTAL TO THE CHILD."
 {¶ 15} For purposes of judicial economy we have consolidated these appeals.
 II. {¶ 16} In his sole assignment of error, Father contends that the trial court's decision permitting Mother to retain custody of Baylee was against the manifest weight of the evidence. Specifically, Father challenges the trial court's implicit finding that Mother is a suitable parent, and the court's explicit finding that it is in Baylee's best interest to remain in Mother's custody.
 {¶ 17} In support of his argument, Father notes that Mother: (1) failed to enter an appearance in the custody action; (2) was serving almost two years in prison for multiple criminal convictions; (3) was deemed likely to recidivate; (4) was a drug addict who had not responded favorably to treatment; and (5) was unable to adequately care for Baylee even when she was not incarcerated. Father notes that none of the evidence adduced at trial was favorable to Mother, as even Mother's own parents sought to obtain custody on the ground that Mother was not a suitable parent for Baylee.
 {¶ 18} A trial court enjoys broad discretion in custody proceedings. Davis v. Flickinger (1997), 77 Ohio St.3d 415, paragraph one of the syllabus. This is due, in part, to the fact that "custody issues are some of the most difficult and agonizing decisions a trial judge must make." Id. at 418. We will not disturb a trial court's custody determination unless the court abused that discretion. Miller v. Miller (1988),37 Ohio St.3d 71, 74. An "abuse of discretion" connotes that the court's attitude is "unreasonable, arbitrary, or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219; Booth v.Booth (1989), 44 Ohio St.3d 142, 144.
 {¶ 19} While the trial court has discretion to grant or deny a change of custody, the record must contain sufficient factual evidence to support the court's findings. Beekman v. Beekman
(1994), 96 Ohio App.3d 783, 787. We will not reverse a judgment as being against the manifest weight of the evidence when the record contains some competent, credible evidence going to all the essential elements of the case. C.E. Morris Co. v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279, syllabus. In conducting our review, we must make every reasonable presumption in favor of the trial court's findings of fact. Myers v. Garson (1993),66 Ohio St.3d 610, 614; Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80. We give deference to the trial court as the trier of fact because it is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id. at 80.
 {¶ 20} R.C. 3109.04(E)(1)(a) governs the modification of a prior decree allocating parental rights. R.C. 3109.04(E)(1)(a) provides in relevant part: "The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies: * * * (iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."
 {¶ 21} Thus, in order to modify the previous allocation of custody as between Mother and Father, the trial court had to find that: (1) a change of circumstances occurred; (2) modification of custody is in the child's best interest; and (3) the advantages of the change of environment to the child outweigh the harm likely to be caused by the change. Here, the court found and the parties do not dispute that Mother's incarceration constituted a change of circumstances.
 {¶ 22} The next step in the court's inquiry would ordinarily be the determination of the child's best interest. R.C.3109.04(F)(1) lists the factors that a court must consider in determining the child's best interest. It provides: "In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to: (a) The wishes of the child's parents regarding the child's care; (b) If the court has interviewed the child in chambers * * *, the wishes and concerns of the child, as expressed to the court; (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) The child's adjustment to the child's home, school, and community; (e) The mental and physical health of all persons involved in the situation; (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; (g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor; (h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25
of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child; (i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; (j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.
 {¶ 23} In a custody dispute between parents the best interest standard of R.C. 3109.04(F)(1) begins with the premise that both parents are suitable to care for the child. In re Daily, Athens App. No. 02CA31, 2003-Ohio-787 at ¶ 10, citing Thompson v.Thompson (Aug. 10, 1995), Highland App. No. 94CA859. Therefore, the child's best interest is generally the only relevant consideration when determining which parent should have custody. Id., citing In re Pryor (1993), 86 Ohio App.3d 327, 333. However, the presumption of parental suitability inherent in R.C.3109.04(F)(1) may be rebutted.
 {¶ 24} Here, the trial court was asked to consider not only Father's motion to modify custody, but also with the Schwendemans' petition for custody. Thus, the trial court simultaneously considered both a parent versus parent custody dispute and a parent versus non-parent custody dispute.
 {¶ 25} The right of parents to raise their own child is an "essential" and "basic civil right," natural parents have a paramount right, as against third parties, to custody of their children. In re Murray (1990), 52 Ohio St.3d 155, 157, citingStanley v. Illinois (1972), 405 U.S. 645, 651; Clark v. Bayer
(1887), 32 Ohio St. 299, 310. Therefore, in a custody dispute between a natural parent or parents and a third party, a court must balance a child's welfare against a parent's right to raise his own child. Clark, supra.
 {¶ 26} In In re Perales (1977), 52 Ohio St.2d 89, the Ohio Supreme Court held that: "based on the concern displayed in the Clark opinion for balancing the interests of both parent and child, that parents may be denied custody only if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent is otherwise unsuitable that is, that an award of custody would be detrimental to the child." Perales at 98.
 {¶ 27} Therefore, under the holding of Perales, a court may award custody of a child to a third party, where it finds that the parents are unsuitable for one or more of these reasons. If the evidence demonstrates that a parent is unsuitable for purposes of a custody dispute between the natural parent and a non-parent, it logically follows that the finding of unsuitability would also preclude that parent from prevailing in a custody dispute between the two natural parents. Hence, we conclude that a finding of parental unsuitability in the context of a natural parent — non-parent custody dispute may rebut the R.C. 3109.04(F)(1) presumption that a parent is suitable to care for the child in the context of a simultaneous custody dispute between the two parents.
 {¶ 28} For this reason, it would appear that the threshold issue presented here is whether either or both of the parents are suitable parents. However, the magistrate began his analysis with the presumption that both parents were suitable to care for Baylee and proceeded to determine the best interest of the child pursuant to R.C. 3109.04(F)(1). In doing so, the magistrate found that the following factors weighed in favor of Mother's retention of custody: (1) the child's wishes and concerns; (2) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; and (3) the child's adjustment to the child's home, school, and community. The magistrate specifically found that Baylee wished to remain in her current situation at her grandparent's home, due in large part to the fact that she does not want to leave her brother, her school, and her friends. The magistrate also found that Baylee has a strong attachment to Mother's relatives because the Schwendemans have helped raise her since she was a baby, and that she basically lived in the Schwendemans' home since her birth.
 {¶ 29} While these factors are all relevant to the determination of Baylee's best interest, R.C. 3109.04(F)(1) specifically provides that "the court shall consider all relevant factors, including, but not limited to" the factors enumerated in that section. Here, the trial court weighed Baylee's integration into the Schwendemans' home and family, and the stability of the environment the Schwendemans provide in Mother's favor. However, the court failed to consider any relevant factors outside of those specifically enumerated in the statute, despite the fact that both Father and the Schwendemans introduced substantial evidence that Mother is no longer a suitable parent. In addressing Mother's suitability in the context of the Schwendemans' petition for custody, the magistrate made the simple and conclusory statement that "[Mother] is also a suitable parent." The magistrate then elaborated that "[Mother's] suitability is based on great part on her family's willingness to assist her with Baylee while she is in prison. Should [Mother's] family discontinue their support of [Mother] and Baylee, this would adversely affect [Mother's] suitability."
 {¶ 30} At trial the Father and the Schwendemans presented testimony from numerous witnesses regarding their respective relationships with Baylee, their suitability to care for Baylee, and Mother's corresponding unsuitability. Notably, no one presented any evidence tending to demonstrate that Mother remained suitable to parent Baylee.
 {¶ 31} Upon the Schwendemans' motion, the court appointed Denise Fordham as Baylee's guardian ad litem. Ms. Fordham testified that she spoke with the parties to this action, as well as numerous other persons with relevant information, including Mother. Ms. Fordham testifed that she visited Father and Baylee at Father's residence, and found the residence to be very suitable for Baylee. She noted that Baylee had her own room, and that the home was clean and picked up. She described Father's relationship with Baylee as affectionate and comfortable. She believes that Baylee loves her Father, and stated she had no concerns about Baylee living with him. Ms. Fordham testified that she had concerns about Baylee living with Mother because of Mother's history and instability. She also testified that she believed that the Schwendemans offer Baylee a secure and stable home, and that she had no concerns about the Schwendeman home.
 {¶ 32} Ms. Fordham testified that, in her opinion, based upon her experience with children and families, the disruption of moving from the Schwendemans' home to Father's home would cause Baylee the same short term difficulty such a move would cause any child. But, Ms. Fordham believes that the benefits of Baylee living with her Father outweigh those difficulties. Ms. Fordham stated that if there is an opportunity for children to live with their parents, they should be with their parents.
 {¶ 33} Ms. Fordham also testified that some animosity exists between Father and the Schwendemans, noting that neither party appears to respect the role that the other plays in Baylee's life. She indicated that it is in Baylee's best interest for each family to respect the importance of the other in Baylee's life.
 {¶ 34} Rita Angel, Baylee's school principal testified that Baylee is a well-behaved, delightful little girl, and that she had not noticed any change in Baylee's behavior after Mother' incarceration. She was aware that both Father and Carol Schwendeman attended the only parent/teacher conference for the current school year. She indicated that she did not personally know Father, but that she was aware that the Schwendemans are active in Baylee's schooling. She noted that they attend school activities, and that Larry Schwendeman has been a volunteer coach at the school for two years. Notably, Ms. Angel did not testify regarding any involvement Mother may have had in Baylee's education before her incarceration.
 {¶ 35} Mark Schwendeman, Larry Schwendeman's brother, testified that he has observed Baylee and the Schwendeman's at family, school, and extracurricular functions. He stated that Baylee and the Schwendemans are a family — that the Schwendemans are the people who are raising her. He noted that Mother has had problems over the years, and that he was not sure what would be happening with Baylee if the Schwendemans had not stepped up to raise her.
 {¶ 36} Next, Stacy Urbaniak, the Schwendeman's neighbor, testified that Baylee is a happy, friendly, little girl. Ms. Urbaniak stated that she has always considered the Schwendemans to be Baylee's parents. She also testified that even when Mother was living down the street (for "at least the last two years, maybe three"), she considered that Baylee lived at the Schwendeman home. Specifically, she noted that Baylee would talk about "my dad's house" and "my mom's house," but that she would refer to the Schwendeman's home as her house.
 {¶ 37} Christy Ann Mullins, Mother's sister and the Schwendeman's daughter, testified that Baylee has a normal family relationship with the Schwendemans — they guide her as they would any child, and she treats them as parents. She indicated that Mother has had a "rocky ride" for the last several years, and that the Schwendemans have been the ones taking care of and parenting Baylee "for the last two or three years[.]"
 {¶ 38} Carol Schwendeman testified that Mother had problems for three or four years before the custody hearing. She stated that when Mother had legal or drug problems she "assumed all of the parenting [Mother] could not." When Mother was unable to care for the children, Carol and Larry took Baylee and her siblings in, cared for them, and insured that they had a stable and loving home.
 {¶ 39} In addition to the testimony presented at the hearing, Father introduced certified copies of three of Mother's criminal sentencing entries into evidence. The first entry reflects that, in January 2003, Mother appeared before the Washington County Court of Common Pleas for a dispositional hearing on community control violations in two cases. In both of those cases, Mother was originally sentenced to community control for illegal processing of drug documents in violation of R.C.2925.23(A)(F)(2), fifth degree felonies.
 {¶ 40} At the January 2003 hearing, Mother also appeared for sentencing after having plead guilty to two counts of criminal damaging or endangering in violation of R.C. 2909.06(A)(1)(B), one a first degree misdemeanor, and the other a second degree misdemeanor. Mother admitted that she violated the terms of her community control. The court found that Mother was likely to recidivate because she had prior criminal convictions for which she has not rehabilitated, and that she demonstrated a pattern of drug abuse for which she has not rehabilitated. The court noted that Mother had new misdemeanor convictions while under court supervision and that she had new felony charges pending. Because the court found that Mother was still amenable to community control sanctions, it ordered her to continue her community control under the same terms and conditions previously imposed, with the additional condition that she was to attend and successfully complete the program at the Women's Rural Recovery Program in Athens, Ohio, and pay court costs. The court also sentenced Mother to serve six months at the Washington County jail for her conviction for one count of criminal damaging or endangering, and ninety days for the other. The court then suspended those sentences for two years and granted Mother probation under general terms and conditions, with the additional condition that she attend and successfully complete the Women's Rural Recovery Program.
 {¶ 41} The second sentencing entry reflects that, in December 2003, Mother pled guilty to deception to obtain dangerous drugs in violation of R.C. 2925.22(A) (B)(2), and illegal processing of drug documents in violation of R.C. 2925.23(B)(1) (F)(2), both fifth degree felonies. On February 12, 2004, the Washington County Court of Common Pleas, General Division, sentenced Mother to concurrent ten-month terms of imprisonment.
 {¶ 42} In its sentencing entry, that court found that Mother was on community control in one felony case and was awaiting trial on another felony case when she committed one of the offenses at issue, and awaiting sentencing hearings regarding both of those cases when she committed the other offense. The court also found that Mother had a prior criminal record, including convictions as an adult for criminal damaging or endangering (two separate counts) in 2002 and revocation of community control in 2002.[2] The court also specifically found that Mother had shown a pattern of drug abuse for which she had received treatment on numerous occasions, some that were successful, and some that were not.
 {¶ 43} The third sentencing entry reflects that, in June 2004, Mother plead guilty to attempted deception to obtain dangerous drugs in violation of R.C. 2923.02 and R.C. 2925.22(A) (B)(1), a fourth degree felony; possession of drugs in violation of R.C. 2925.11(A) (C)(4)(a), a fifth degree felony; and illegal processing of drug documents in violation of R.C.2925.23(B)(1) (F)(1), a fourth degree felony. At the sentencing hearing, the court found that Mother was on community control in one case, and was awaiting trial and/or sentencing in another felony case at the time she committed these offenses. Additionally, the court noted that, at the time of sentencing, Mother was already incarcerated for another conviction. The court found that Mother's offense was more serious because one crime was committed for hire, as part of an organized criminal activity, as Mother was in possession of cocaine that she intended to trade for Xanax pills. The court also found that Mother had shown a pattern of drug abuse for which she had numerous opportunities for treatment, some of which were successful, and some that were unsuccessful. Ultimately, the court ordered Mother to serve twelve months imprisonment at the Ohio Reformatory for Women at Marysville, Ohio for each of her three convictions, to be served concurrently with each other, but consecutively to her previously imposed ten-month sentence.
 {¶ 44} Nothing in the record tends to demonstrate Mother's suitability to parent Baylee. On the contrary, the only evidence of any parenting decision made by Mother is the evidence of her decision to allow the Schwendemans' to parent her children when she was unable to care for them herself. While the trial court found that Mother's suitability was based "on great part on her family's willingness to assist her with Baylee while she is in prison[,]" the evidence adduced at the custody hearing demonstrated that the Schwendemans assumed responsibility for Baylee's care long before Mother's incarceration.
 {¶ 45} Mother began her incarceration in February 2004, and the custody hearing took place in May 2005, although several witnesses testified that the Schwendemans had been caring for Baylee for two to three years. Moreover, the testimony of Mark Schwendeman, Stacy Urbaniak, and Christy Ann Mullins reveals that, based upon the Schwendemans' substantial involvement in Baylee's life, and presumably the corresponding lack of involvement on Mother's part, they considered the Schwendemans to be Baylee's parents.
 {¶ 46} The record clearly demonstrates, by a preponderance of the evidence, Mother's total inability to provide care or support for Baylee. Specifically, we note Mother's: (1) history of drug abuse; (2) history of failed drug treatment efforts; (3) criminal record; (4) failure to respond favorably to criminal sanctions; (5) likelihood of recidivism; (6) complete reliance upon the Schwendemans to provide Baylee's care, to the extent that family members, family friends, and neighbors considered the Schwendemans to be Baylee's parents.
 {¶ 47} We also note that Mother did not even bother to enter an appearance in the very custody action in which the trial court determined that Mother was a suitable parent. Furthermore, the record reflects and the magistrate found that Mother executed a consent to placement, wherein she stated "I, Tracy Schwendeman, the natural mother of Baylee Schwendeman, do hereby consent to my parents Larry and Carol Schwend[e]man having custody of my daughter, Baylee Schwendeman." This consent to custody, when combined with Mother's earlier placement of Baylee in the Schwendeman's care, could arguably be construed as Mother's contractual relinquishment of her right to custody.
 {¶ 48} Based upon the foregoing, we are compelled to conclude that the trial court's determination that Mother is a suitable parent is against the manifest weight of the evidence. Accordingly, we sustain Father's sole assignment of error.
 III. {¶ 49} In their sole assignment of error, the Schwendeman's contend that the trial court erred in finding that Father was a suitable parent for Baylee. The Schwendemans note that all of the testimony presented at the custody hearing demonstrates that Baylee is a happy and well-adjusted child in her grandparents home, and that the changes necessitated by a change of custody to Father would be detrimental to Baylee's wellbeing. Therefore, they contend that a Father is an unsuitable parent pursuant to the Ohio Supreme Court's holdings in Perales, supra, andReynolds v. Goll (1996), 75 Ohio St.3d 121.
 {¶ 50} As we stated above, in Perales, the Ohio Supreme Court held that: "based on the concern displayed in the Clark opinion for balancing the interests of both parent and child, that parents may be denied custody only if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent is otherwise unsuitable that is, that an award of custody would be detrimental to the child." Perales at 98.
 {¶ 51} The Schwendemans focus their argument regarding Father's unsuitability upon the last criteria enumerated by thePerales court. Specifically, they contend that the trial court erred in finding that Father is suitable because they contend that an award of custody to Father would be detrimental to Baylee. They concede that Father may be able to adequately meet Baylee's physical needs because he is gainfully employed and can provide her with a safe and adequate home. However, they contend that the change of environment if the court were to award custody to Father would, nonetheless, be harmful to Baylee because she is already happy and well-adjusted in their home.
 {¶ 52} In support of their argument, the Schwendemans note that the magistrate found Baylee would suffer harm if she underwent the change of environment necessitated by a change of physical custody. Our review of the record reveals that the magistrate specifically addressed this argument in his decision. He noted that he made that finding in the context of a "best interest" analysis between Father and Mother in the original custody action. In that decision, the magistrate stated that "[Father] offers Baylee a complete disruption of her life. The child will be deprived of all the interpersonal contacts she has developed in her life. She will be forced to undergo the stress and psychological trauma of a relocation, and the substitution of strangers in a daycare center in Columbus for the people who have raised her since birth in the Schwendeman home. In place of her mother, her brother, her grandparents, and her aunts and uncles, her day-to-day care will be performed by her father, a single man with no experience raising a young child. The change of physical custody proposed by [Father] would be a detriment to the child and her development." However, as the magistrate aptly noted, he made that finding in the context of a best interest analysis conducted to determine which of Baylee's natural parents, who otherwise stood equal before the court, should obtain legal custody of her. In contrast, the Schwendemans ask this court to apply those findings in the context of a natural parent — non-parent custody dispute, where there is a presumption that the natural parent has a paramount right to custody of his child over the non-parent.
 {¶ 53} Here, relying upon the Seventh Appellate District's holding in In re Davis, Mahoning App. No. 02-CA-95, 2003-Ohio-809, the magistrate specifically determined that "the detriment from this change of custody is not the type of detriment contemplated by Perales that would make a parent unsuitable" in the context of a custody dispute between a natural parent and a non-parent.
 {¶ 54} In Davis, the child's father appealed an award of custody to the maternal grandmother upon a finding that an award of custody to the father would be detrimental to the child. There, the court relied upon its decision in In re Lowe,
Columbiana App. No. 00-CO-62, 2002-Ohio-440, wherein it found that under the suitability test, "`[s]imply because one situation or environment is the `better' situation does not mean the other is detrimental or harmful to the child.'" Davis at ¶ 12, quoting Lowe at ¶ 9, citing In re Porter (1996),113 Ohio App.3d 583, 589. Additionally, the Davis court noted that the United States Supreme Court previously held a Washington statute unconsititutional where it permitted "`any person' to petition a court at `any time' for visitation whenever visitation could `serve the best interest of the child.'" Davis at ¶ 14, citingTroxel v. Granville (2000), 530 U.S. 57; Wash. Rev. Code26.10.160(3).
 {¶ 55} In discussing Troxel, the Davis court stated: "Importantly, the court highlighted the fact that no lower court had found the parent in that case unfit. The court stated, `[t]hat aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children.' [Troxel] at 68. The court continued, stating, `so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.' Id. at 68-69. The court also opined, `the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a `better' decision could be made. Troxel, 570 U.S. at 72-73."Davis at ¶ 15.
 {¶ 56} Relying upon those principles discussed in Troxel,
the Davis court found that just because the child would have a period of adjustment if she moved from her grandmother's residence to her father's residence, that did not mean that it was detrimental for her to be raised by her father. Davis at ¶ 29. In reaching the conclusion that the obvious transitional issues of moving from one home to another (i.e. change of home, school, community, friends) did not support the type of detriment contemplated in Perales, the Davis court noted that other courts that found an award of custody to a parent detrimental found serious problems with the unsuitable parent. Id. at ¶ 27.
 {¶ 57} Specifically, the Davis court noted the following cases where serious problems supported findings of parental unsuitability: "In re Medure, 7th Dist. No. 01 CO 03, 2002-Ohio-5035 (children distrusted the parent; parent verbally and physically abused the children, including hitting them with ropes; parent did not keep adequate supplies of food at home);In re Adams, 9th Dist. No. 01CA0026, 2001-Ohio-1652 (parent was incarcerated for three months after child was born; parent currently on probation in two counties; parent had disorderly conduct charges pending against him; parent had not paid child support for some time; parent had failed to use a car seat when transporting child; parent was unable to secure a stable home or lasting employment); Slivka v. Sealock (May 18, 2001), 5th Dist. No. 00-CA-13 (parent made statements that she wanted child back because she always wanted three children and, if child was not returned to her, she would just get pregnant again; parent had history of psychological and behavioral problems; parent's husband had domestic violence conviction); Reynolds v. Ross Cty.Children's Services Agency (1983), 5 Ohio St.3d 27,448 N.E.2d 816 (psychologist and psychiatrist testified they believed oldest child's allegations of sexual abuse by parent and that the children were afraid of being returned to the parent)." Id. at ¶ 27.
 {¶ 58} Here, the magistrate found that a grant of custody to Father would be detrimental in that it would remove Baylee from her familiar surroundings, including her grandparents' home, her school and her friends. However, the trial court also concluded that, based upon the holding in Davis, the detriment did not rise to such a level that Father was unsuitable to be Baylee's legal custodian. As the Davis court noted, a transitional visitation period leading up to full custody would help the child adjust to the change of environment. Davis at ¶ 28.
 {¶ 59} The Schwendemans also argue that the magistrate found Baylee would spend time in a daycare center after school and during her school breaks instead of spending that time with family members if she was in her Father's custody. They contend that this is a "serious problem" with Father's home. While it may be desirable for a child to spend that time with family members rather than in daycare, we cannot find that the trial court abused its discretion in declining to find that Father's need to utilize daycare services rendered him unsuitable to parent Baylee. Indeed, if Father's employment and resulting need for daycare services rendered him unsuitable, virtually every working parent would be unsuitable to care for their own children when compared with an unemployed or retired grandparent seeking custody. As the Davis and Troxel courts noted, the state cannot infringe on a parent's fundamental right to make child rearing decisions simply because a "better" decision could be made. Davis at ¶ 15, citing Troxel, 570 U.S. at 72-73.
 {¶ 60} The Schwendemans urge us to find that the trial court erred in finding Father is suitable to care for Baylee on the ground that he cannot meet her special emotional needs arising from the "significant stress and loss" she has suffered during the past year and a half. They point to the fact that Baylee is a happy and well-adjusted child in their home, and that her condition is the result of their careful and conscious effort to make the adjustment as smooth as possible. They note that, while Father exercises his scheduled visitation with Baylee, he does not now, nor has he in the past called her on the phone during the "crisis" caused by her Mother's incarceration and the removal of her sister from the Schwendeman home. They argue that Carol's availability as a stay at home grandmother, and Baylee's existing integration in their home makes them "better able to meet those emotional needs."
 {¶ 61} While the Schwendemans argue that Baylee has special emotional needs that Father allegedly cannot meet, by all accounts, Baylee is a cheerful, outgoing, well-adjusted little girl who has exhibited no behavioral changes following her Mother's incarceration and her sister's removal from her family home. The Schwendemans claim that these events have had an obvious serious impact upon Baylee. Yet, they have introduced no evidence tending to demonstrate the negative effects of those events on Baylee, save the basic assumption that the removal of a mother and sister from the family home would be traumatic to any child.
 {¶ 62} The record contains no evidence that Baylee has required anything but the love and attention of her family members during this time. The Schwendemans are undoubtedly correct that their care and the consistency of Baylee's environment during these difficult times has played a significant role in her ability to adapt and overcome the adversity. However, the substance of their arguments boils down to their belief that the change of environment would be detrimental to Baylee. Having already found that the trial court did not abuse its discretion in determining that the detrimental effects of the change of environment and Father's need to utilize daycare services did not constitute the type of detriment required to render a parent unsuitable, we overrule the Schwendeman's sole assignment of error and affirm the trial court's denial of their petition for custody.
 IV. {¶ 63} In conclusion, we find that the trial court's presumption that Mother was a suitable parent is against the manifest weight of the evidence. Accordingly, the trial court abused its discretion in permitting Mother to retain custody of Baylee. Additionally, we find that the trial court did not abuse its discretion in determining that Father was a suitable parent, where the court determined that any detriment caused by a change of custody to Father was insufficient to render Father unsuitable. Accordingly, we remand this cause to the trial court for further proceedings consistent with this decision.
JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CAUSEREMANDED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED IN PART, REVERSED IN PART, AND CAUSE REMANDED to the trial court for further proceedings consistent with this opinion. Appellant Stacy Gorham shall recover from Appellants Larry and Carol Schwendeman, and Appellee Tracy Schwendeman costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Washington County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Abele, J. and McFarland, J.: Concur in Judgment and Opinion.
[2] The court also found that Mother had other criminal convictions dating back to 1994. However, pursuant to R.C.3109.04(E)(1)(a), only facts that have arisen since the prior custody decree are relevant here.